## HUTCHINSON-MOORE LUMBER CO. *v.* PITTMAN.*

(Division B.   May 6, 1929.)

[122 So. 191.   No. 27838.]

(1)

*Corpus Juris-Cyc References: Master and Servant, 39CJ, section 1517, p. 1315, n. 1; section 1521, p. 1319, n. 52; section 1558, p. 1341, n. 90. On the question as to who is an independent contractor, see annotation in 65 L. R. A. 445; 17 L. R. A. (N. S.) 371; 19 A. L. R. 227; 14 R. C. L. 67; 3 R. C. L. Supp. 163; 4 R. C. L. Supp. 869; 5 R. C. L. Supp. 738.

*J. A. McFarland* and *Deavours & Hilbun,* for appellant.

*James W. Cassedy, James W. Cassedy, Jr.,* and *Currie & Currie,* for appellee.

Argued orally by *Henry Hilbun,* for appellant, and *James W. Cassedy,* for appellee.

ANDERSON, J. Appellee brought this action in the circuit court of Jasper county against appellant, Jack Magee, and Sydney Hickman, for damages for an injury received by appellee while engaged as a woods sawyer on timber lands of appellant caused by the alleged negligence of appellant. There was a trial resulting in a directed verdict and judgment in favor of Sydney Hickman, and in a verdict and judgment against appellant and Jack Magee. From the latter judgment appellant alone prosecutes this appeal.

As stated, at the time of his injury, appellee was a woods sawyer on timber lands belonging to appellant. Appellee and Raz Sims were saw partners and members of a timber crew, of something like twenty in number, engaged on appellant's lands in sawing down trees and sawing them up into logs to be manufactured into lumber by appellant's mill. The evidence on behalf of appellee tended to show that through the fault of A. J. Magee, in directing him and his saw partner, Sims, how to fell a tree in order to dislodge another tree that had fallen against still another, appellee received the injury for which he sued. Appellee undertook to fasten liability for his injury on appellant on the ground that the rela-

tion of master and servant existed between appellant and Magee in the logging of appellant's timber, and that Magee was acting in the scope of his employment as such servant of appellant in directing appellee how to fell the tree which caused the injury. Appellant defended on the ground that Magee was not its servant, but an independent contractor, and, therefore, if appellee was injured through the negligence of Magee, liability there-for was on Magee alone, and not on the appellant.

At the time of appellee's injury, and for some time before, there was in existence between appellant and Magee a written contract providing for the sawing down and sawing into logs the merchantable timber on certain of appellant's lands in Jasper county, which contract follows:

"This contract and agreement made and entered into this the 11th day of April, A. D. 1927, by and between the Hutchinson-Moore Lumber Company, a corporation chartered under the laws of the State of Missouri, but having a place of business in Foulke, Jasper county, Mississippi, hereinafter known as the party of the first part, and A. J. Magee of Jasper county, Mississippi, hereinafter known as the party of the second part, Witnesseth: That, whereas, party of the first part conducts a sawmill and owns certain standing timber, and whereas the party of the second part desires to contract with the party of the first part to fell the said timber and saw the same into logs of proper length for the requirement of the party of the first part; Now, Therefore, it is agreed between the parties hereto as follows, to-wit: (1) The party of the second part doth hereby agree that he will saw down and saw up into logs in lengths to be designated by the party of the first part all the pine and hardwood timber standing or being in Jasper county, Mississippi, described as follows, to-wit: (Here follows description of the land.) (2) The party of the second part doth obligate himself to fell the said timber by saw-

ing the trees within twelve inches of the ground, the trees to be cut into logs of such lengths as may be designated from time to time by the party of the first part. All the timber suitable for manufacture into lumber is to be cut by the said party of the second part, but said party of the second part expressly agrees to cut all pine ten inches in diameter at the stump or larger and to cut all gum and all beech fourteen inches in diameter at the stump or larger, all oak and magnolia twelve inches in diameter at the stump and larger, all poplar, all ash, and all hickory ten inches in diameter at the stump or larger. (3) The party of the first part obligates to pay for the said felling of said timber and the cutting thereof the sum of ninety-five cents per M feet log scale, and to pay therefor after the timber is hauled to the dummy line of the said party of the first part and put in bank within forty feet of dummy line of party the first part ready for loading on log train of the party of the first part. That is to say, the party of the first part will measure the logs after they have been hauled and placed ready for loading, and payment therefor shall be made every two weeks on the regular pay days of the party of the first part. In measuring logs Scribner's Lumber and Log Book by Doyle's rule, known as 'Doyle's Scribner Scale' shall govern and measurements shall be made from inside bark at the smaller end of the log. (4) The party of the second part obligates himself to use proper precautions to avoid the damage to fences and agrees to indemnify the party of the first part against any and all damages to any other person by reason of the said cutting and felling of said timber. (5) If the party of the second part shall fail to cut the timber clean and down to the sizes herein named, the trees left standing shall be cruised and the party of the second part shall pay to the party of the first part five ($5) dollars per M feet log scale for such scale left standing, which sum is agreed upon between parties hereto as liquidated damages and

not by way of penalty. (6) If the party of the second part shall not cut logs fast enough and in sufficient quantities that the mill of the party of the first part may be operated at its maximum capacity, then and in that event, party of the first part shall have the option of canceling this contract, or of entering the said land and cutting such additional timber as may be necessary to the end that its said mill may be operated at its maximum capacity, all of which shall be at the expense of the party of the second part. (7) Party of the second part shall be governed at all times by instructions from the party of the first part as to where timber shall be cut and the sequence in which governmental subdivisions shall be entered. The party of the first part may authorize and/or direct the temporary abandonment of any particular part of the timber and direct operations to be conducted at some other point, and the party of the second part shall reenter governmental subdivisions temporarily abandoned and cut any timber left standing when and as directed. (8) If the mill of the party of the first part shall be destroyed by fire, or tornado, party of the first part shall have the option of termination of this contract. (9) If the price of lumber shall become so low that the party of the first part is unable to operate its mill at a profit, or if any other cause shall make it impossible for the party of the first part to operate its said mill with reasonable profit, then the party of the first part shall have the option of canceling this said contract or of suspending operation hereunder until such time as said party of the first part shall resume operation. Witness the signature of the parties hereto on the day and date first herein written.''

Appellee was employed to do the work he was engaged in when injured by H. R. Griffin. Appellee's contention is that Griffin was employed by Magee to do the work and, as stated, Magee was employed by appellant, and

therefore both Magee and Griffin were servants of appellant.

The principal ground relied on by appellant for the reversal of the judgment appealed from is that the court erred in refusing appellant's request for a directed verdict, and the determination of that question turns upon the question whether, at the time of the injury, the relation of master and servant existed between appellant and Magee. Or rather, to be more exact, the question is whether or not there was sufficient evidence to go to the jury tending to show that at the time of the injury the relation of master and servant existed between the appellant and Magee with reference to the work appellee was engaged in when injured.

It will be observed from the contract between appellant and Magee that among the obligations undertaken by the latter was that when the trees were felled and sawed into lengths, he was to deliver the logs within forty feet of appellant's logging road "in band" so that they could be conveniently loaded on appellant's cars. In order to so deliver the logs, it became necessary to clear off the loading ground. Appellee and his saw partner, Sims, were so engaged at the time of appellee's injury. As stated above, they were felling a tree in such a manner as to dislodge another tree that was resting on still another. Appellee's evidence tended to show that Magee was directing the method by which that result should be accomplished, and directed that it be done in a dangerous manner, when there was a safe way, which resulted in appellee's injury.

Magee, after operating awhile under his contract with appellant, sublet the contract verbally to H. R. Griffin. Thereafter Griffin employed the timber crew engaged in the work, and had immediate control and supervision thereof. Griffin employed the appellee. However, Magee still continued to exercise supervision and control both over Griffin and his employees. Appellant had a woods

superintendent, Sydney Hickman. Appellee made no claim that Hickman was present at the time of appellee's injury directing the method by which the loading ground should be cleared off, nor did appellee claim that Hickman, at any other time, gave any directions with reference thereto. Appellee's evidence as to liability consisted of his own testimony and that, of several of his coemployees. They testified that they understood that they were employees of appellant, and that they were working for appellant; that although they were immediately employed by Griffin to do the work, nevertheless they understood that Griffin was employed by Magee, and that Magee was employed by appellant; and that Hickman was looked to as having authority over all engaged in the work. Magee testified that he understood the contract between himself and appellant to mean that appellant could put an end to the contract whenever it chose so to do. Appellee and his coemployee witnesses admitted on cross-examination, that they were employed by Griffin alone, and the undisputed evidence was that it was Griffin who paid and had the right to discharge employees; and that the only supervision or control appellant undertook to exercise over the work was through Hickman, its woods superintendent; and that such supervision and control consisted solely of directions looking to the carrying out of the contract between appellant and Magee, and not to the method or manner of carrying out the contract. They testified that Hickman gave instructions as to the order in which the trees should be cut from the different governmental subdivisions of the land, how high from the ground they should be cut, and what lengths and sizes they should be. As we understand the record, there is no evidence tending to show that Hickman ever exercised any control or supervision whatsoever over the operation of the timber crew except as to the results required by the contract between appellant and Magee. The evidence showed that the manner and

method of doing the work were left entirely in the hands of Magee and his subcontractor, Griffin. The testimony of appellee and his coemployees to the effect that Hickman had the supervision and control both over the results to be obtained, and the manner and method of obtaining those results, was mere opinion evidence on their part and must yield to the facts admitted by them. Magee's testimony, to the effect that he understood the contract between himself and appellant to give the latter the right to put an end to the contract when appellant chose, was also merely his opinion as to what the contract meant in that respect. The contract speaks for itself. It expressly provides the conditions that must exist in order to authorize the appellant to put an end to it. The evidence showed, without conflict, that the contract was in force, and that Magee and his subcontractor, Griffin, were still working under it when appellee was injured. Appellee's contention that the contract should not be regarded in determining the relationship existing between appellant and Magee because, by its terms, no time was fixed for its completion, is without merit, for the contract plainly provides that Magee was to cut and deliver to appellant at its logging road *all* the merchantable timber from the lands specifically described in the contract.

In *New Orleans, B. R., V. & M. R. Co.* v. *Norwood,* 62 Miss. 565, 52 Am. Rep. 191, the court said that numerous tests had been suggested for the determination of the question, "Whose servant is this?" among which were the following: (1) The right to select the servant; (2) the right to discharge the servant; (3) the right to control the servant; and (4) that he is not a master who is interested in the ultimate result of the work alone as a whole, but not in the details of the performance.

In *Callahan Const. Co.* v. *Rayburn,* 110 Miss. 107, 69 So. 669, the court held that an independent contractor is one who renders service in the course of an occupation

representing the will of his employer only as to the result of his work, and not as to the means by which it is accomplished. In *Crescent Baking Co.* v. *Denton*, 147 Miss. 639, 112 So.. 21, the court held that a truck driver engaged in delivering bread along a route designated by the baking company from which he purchased the bread and over whom the baking company had no control, except as to the route, in the operation of the business, and in selling and delivering the bread to patrons, was not an employee of the baking company so as to create liability for the death of a child killed by the truck while being so operated; that the main element required to constitute the relationship of master and servant is that the servant be subject to the control of the master in carrying on the business at the time of the injury. *McBride* v. *Jerry Madden Shingle Co.*, 173 Mich. 248, 138 N. W. 1077; *Gay* v. *Roanoke R. & Lumber Co.*, 148 N. C. 336, 62 S. E. 436; *Knowlton* v. *Hoit*, 67 N. H. 155, 30 A. 346; and *Scales* v. *First State Bank*, 88 Or. 490, 172 P. 499, are all cases strongly supporting appellant's contention. The contract between appellant and Magee fixed the relationship between the latter and the former, and that relationship was not one of master and servant, but instead, under the plain provisions of the contract, Magee was an independent contractor. By the terms of the contract, Magee obligated himself alone to bring about certain net results. The method or manner of bringing about such results were, by the contract, left solely with Magee. We think the relationship between appellant and Magee was substantially the same as exists between an owner of a lot and a building contractor, where the latter agrees to construct on the lot, and turn over to the owner, a "lock and key job," the building to be erected under supervising architect representing the owner. To illustrate, A lets a contract to B to erect a residence on A's lot according to plans and specifications made a part of the contract. The plans and specifications are

prepared by an architect representing A, the owner, and the building is to be erected under the supervision of the architect, whose authority alone is to see that the contract and plans and specifications are complied with. The architect has nothing to do with the manner or method of doing the work, nor with the employment of mechanics and laborers necessary to carry on the work, nor with the appliances and machinery used in carrying it on. His supervision is confined to bringing about the net results contracted for. Would the owner of the lot be liable to an employee of the contractor, for an injury received by the employee, because of the negligent manner in which the contractor directed the employee to do the particular piece of work he was engaged in? We think clearly not. The supervising architect would have no control over him. And likewise in the present case. Magee undertook by his contract with appellant to deliver logs convenient for loading on appellant's logging cars. That was one of the results appellant contracted for. Appellant had nothing to do either with the manner of hauling the logs out of the woods, or preparing the loading ground for their reception.

We think it clear that Magee was an independent contractor in and about the work he was directing when appellee was injured, there being no substantial conflict in the evidence on that issue of fact. The result is that the trial court should have directed a verdict in favor of appellant.

*Reversed, and judgment here.*